Ramon Vasquez # MG 9685
SCI-Huntingdon
1100 Pike St.
Huntingdon, Pa. 16654

Clerk of Court
U.S. Dist. Ct., Eastern Dist. of Pa.
601 Market St., Rm. 2609          Oct. 7, 2020
Philadelphia, Pa. 19106

Re: Vasquez v. Berks County et. al.
     (civil-rights action)

Dear Sir/Mam,
        I am filing this civil-rights complaint
however I am unable to send 3 more copies
and service forms for defendant's Castro, Drepped,
and Weber because our unit was on quarantine
status and I have to wait until Tuesday when
we're cleared. Please find enclosed a memo from
my unit counselor corroborating these events.
    I will send the remaining copies soon as we
are able to use the law library- Also find enclosed
Application to proceed In forma Pauperis. Contact me
as soon as you can regarding this action, thank you
for your tim.
                        Very truly yours
                        R. Vasquez


**pennsylvania**
DEPARTMENT OF CORRECTIONS

**MEMO**

**TO**   Whom It May Concern

**FROM** K. Eckenrod, Corrections Counselor 2

**DATE** 10/6/2020

MG9685 Vasquez, Ramon is currently housed at SCI Huntingdon.  SCI Huntingdon is currently following guidelines set forth by the Center for Disease Control (CDC) and Pennsylvania Department of Health (PA DOH) for best practices during the COVID-19 Pandemic.  Due to Mr. Ramon's incarceration at our facility he is under our care and is required to follow recommendations set forth by the CDC and PA DOH.  On 9/23/2020, the cohort Mr. Ramon resides in at SCI Huntingdon was placed on Advanced Quarantine due to a member of his cohort testing positive for COVID-19.  Due to the regulations of the quarantine, Mr. Ramon was unable to attend Law Library at SCI Huntingdon on 9/23/2020, 9/29/2020, 9/30/2020 and 10/6/2020.  As a result of being unable to attend Law Library, Mr. Ramon was unable to print any forms needed for filing, make copies needed or do research to complete his legal work.

I am writing this letter as proof that Mr. Ramon was not granted sufficient time to work on his legal work while quarantined.  As a result, this would have made it difficult for Mr. Ramon to meet a legal deadline.

Thank you for your consideration in this matter,

**K. Eckenrod, Corrections Counselor 2**

## IN THE UNITED STATES DISTRICT COURT,
## EASTERN DISTRICT OF PENNSYLVANIA

RAMON VASQUEZ                  :
       (Plaintiff)

    vs.                      :      CIVIL-ACTION

BERKS COUNTY, CHRISTIAN LEINBACH,
KEVIN BARNHARDT, MARK SCOTT,     :      DOCKET NO._____
JOHN ADAMS, SCOTT LASH, ERIC
WEAKNECHT, S.GRAFFIUS, C.SADLER,
JANINE QUIGLEY, JEFFREY SMITH,     :
MIGUEL CASTRO, DREPPERT, LT. WEBER,    **JURY TRIAL DEMAND**
       (Defendant's)

## INTRODUCTION

. This is a civil rights complaint filed by the Plaintiff Ramon Vasquez, pursuant to 42. U.S.C. § 1983 seeking monetary, and punitive damages. Vasquez alleges violation of the Eighth Amendment of the United States Constitution; Cruel and Unusual Punishment. Violation of the Fourteenth Amendment of the United States Constitution; Deprivation of Due-Process. Vasquez also alleges State Tort claims of Negligence, Negligence Respondeat Superior, and Intentional Infliction of Emotional Distress.

## JURISDICTION & VENUE

. Jurisdiction of this court is invoked under 28 U.S.C § 1331 in that this action arising under the constitution of the United States.
. Jurisdiction of this court is invoked under 28 U.S.C § 1342 (a)(3) in that this action seeks for equal rights within the United States.
. Supplemental jurisdiction is invoked under 28 U.S.C. 1367 in that plaintiff also alleges State Law Tort Claims.
. The Eastern District of Pennsylvania is invoked under 28 U.S.C. §1391 (b)(2) because it is where the events given rise to this complaint occured.

46868 pg 22 of 78 for RAMON VASQUEZ

## PARTIES

. Plaintiff, Ramon Vasquez, is and was at all relevant times mentioned herein , an adult of the United States, and resident of Pennsylvania.

. Defendant Berks County, is and was at all relevant times mentioned herein, a local government agency of the state of Pennsylvania, and is sued in its official capacity.

. Defendant, Christian Leinbach, is and was at all relevant times mentioned herein, the Chairman Commissioner of Berks County, and a member of the Prison Board, who had final policy authority over the Berks County Jail, and is sued in his indiviual capacity.

. Defendant, Kevin Barnhardt, is and was at all relevant times mentioned herein, a Commissioner of Berks County, and a member of the Prison Board, who had final policy authority over the Berks County Jail, and is sued in his individual capacity.

. Defendant, Mark Scott, is and was at all relevant times mentioned herein, a member of the Prison Board, who had final policy authority over the Berks County Jail, and is sued in his individual capacity.

. Defendant, Scott Lash, is and was at all relevant times mentioned herein, a member of the Prison Board, who had final policy authority over the Berks County Jail, and is sued in his individual capacity.

. Defendant, John Adams, is and was at all relevant times mentioned herein, a member of the Prison Board, who had final policy authority over the Berks County Jail, and is sued in his individual capacity.

. Defendant, Christine Sadler, is and was at all relevant times mentioned herein, a member of the Prion Board, who had final policy authority over the Berks County jail, and is sued in her individual capacity.

. Defendant, S. Graffius, is and was at all relevant times mentioned herein, a member of the Prison Board, who had final policy authority over the Berks County jail, and is sued in his/her individual capacity.

. Defendant, Eric Weacknecht, is and was at all relevant times mentioned herein, a member of the Prison Board, who had final policy authority over the Berks County Jail, and is sued in his individual capacity.

-2-

. Defendant, Janine Quigley, is and was at all relevant times mentioned herein, the Warden of the jail, who was legally responsible for the day to day operations, and welfare of all inmates, and is sued in her individual capacity.

. Defendant, Jeffrey Smith, is and was at all relevant times mentioned herein, the Deputy Warden of the jail, who was legally responsible for the day to day operations, and welfare of all inmates, and is sued in his individual capacity.

. Defendant, Miguel Castro, is and was at all relevant times mentioned herein, the Captain of security, and grievance coordinator, is sued in his individual capactiy.

. Defendant, Lieutenant Weber, is and was at all relevant times mentioned herein, the Lieutenant of security, member of the Institutional Classification Committee, and grievance coordinator, is sued in his individual capacity.

. Defendant, Dreppert, is and was at all relevant times mentioned herein, the person in charge of the maintenance department, and is sued in his individual capacity.

. All Defendant's, at all times relevant herein acted under Color of State Law.

-3-

Ref: 2146868 pg 26 of 78 for RAMON VASQUEZ

## RELEVANT  FACTS

1. On or about August of ‾2018, the plaintiff, Ramon Vasquez,
was on writ from state prison for a P.C.R.A. hearing at the Berks
County Jail System, located in Leesport, Pennsylvania. While there
Vasquez was housed in the disciplinary segregation unit also known
as "Delta Unit", and placed on security status in the B.A.U
(Behavioral Adjustment Unit)  The security status was given to
inmates who were currently problematic, and or were sentenced to
life or death row. This area was located in the rear of Delta's
first floor.

2. Since it was several years since Vasquez was in Berks County
Jail he did not understand why he had been placed on that status.
Vasquez contended that he had been unfairly treated because the last
time he was in the county he challenged multiple tainted polices in
the jail and believed the security status was arbitrarily imposed
by the warden and other supervisors in retaliation to a previous
civil action Vasquez filed against the jail.

3. Vasquez was serving a five to twenty year sentence and was
not a lifer nor on death row. When he asked why he had been placed
on security status the response he received was because of his
sentence. See (Exhibit "1") Which was actually contrary to jail
policy. See (Exhibit "2")

4. Delta Unit was part of the old jail that had been built in
1933 and had significant structural damage. Vasquez cell consisted
of a concrete slab where his mattress went, a toilet, and a window.
There were no desk, seat, shelves, or hooks for his clothing and

-4-

-towels. Most times Vasquez was forced to dry his clothes by draping them over his toilet, other times he'd tie them to the old turnace pole in the cell, which was no longer in use. In order to write letters Vasquez was forced to lay on the floor or concrete slab where his mattress went. Long hours in these positions caused a pre-existing injuriy in his right arm and shoulder to become aggitated and worsten.

5.August 10, 2018, Vasquez requested to see a medical provider for the pain he experienced in his lower back, right arm and shoulder. He was later provided tylonol. See (Exhibit "3")

6. October 11, 2018, Vasquez received a misconduct for having medication in his cell during cell inspection, and received ten days disciplinary time. Per policy whenever an inmate received a misconduct they'd be placed on maladaptive status pending the outcome of the misconduct. The problem with the policy is that it automatically imposed restrictions such as change from regular meals to lunch bags which consited of balogna sandwiches every day except for breakfast when cold cereal was given. Vasquez grieved the policy contending that the jail was using food as a punishment.

7. He explained that the principal infraction he was cited and found guilty of, was contraband not for throwing feces or being assaultive with food which would have warranted a change of diet. Because the policy was automatically imposed, Vasquez contended it violated his right to due process because before anything should be taken he should have at least been given a hearing as to why and an opportunity to be heard.

8. The response he received from Defendant Miguel Castro, was that the change of diet was part of the "condition of confinement"

-5-

-on delta unit. That once a hearing finds an inmate not guilty then the restrictions were lifted. Castro went on to say that, that was due process, Castro even went as far as comparing the policy to pretrial-detainees who were awaiting disposition in their criminal cases. Only to concede that pre-hearing inmates faced those restrictions pending the out come of their disciplinary hearings. See (Exhibit "4") Castro finally referred Vasquez to the inmate hand-book. However, the language in the policy left room for discretion-ary use by stating restrictions "MAY" be imposed. See (Exhibit "5")

9. Vasquez appealed that decision and reiterated that the policy violated procedural due process. That it was unfair, arbitrary, and that the conditions of confinement on delta were not in itself different or seperate from the rest of the jail. That while on security status  he received regular meals and was still subjected to the same conditions. Vasquez contended that the policy held no penological interest, was excessive in light of maintaining security, and management.

10. The response he received from Defendant Janine Quigley did not address the issue but diverted to a nutritional standpoint claiming the guidelines for calories and food groups were sufficient and she agreed with Castro's decision. See (Exhibit "6")

11. During cold winter months a common practice by unit officers who wanted to minimize their workload were to offer inmates outside yard without proper clothing such as winter coats, winter hats, gloves, or footwear. Inmates were placed outside in only the standard uniform, a sweater, and hospitol crocs. Needless to say inmates rarely took yard. January 24, 2019, Vasquez filed a grievance about the silent policy or custom that was longstanding. Vasquez pointed

-6-

Ref: 2146868 pg 32 of 78 for RAMON VASQUEZ

-out that subjecting him and other similarly situated inmates to
those conditions without proper clothing was a health risk, which
exposed them to possible sickness. Finally, Vasquez offered an
alternative, and requested that they be able to use the indoor gym
for their exercise time.

However, the response Vasquez received from Castro was that
no one forced Vasquez outside with insufficient clothing during
inclement weather. Castro claimed that no policy existed that placed
delta inmates outside during inclement weather. However, Castro
failed to note that all units were digitally monitored and in fact
showed his officers placing people outside in the early morning
hours. As such, Castro went on to list all the factors that warranted
cancellation of outside yard. He then stated that he would go over
the issues with his officers to ensure indoor rec. during those
situations. See (Exhibit "7")

12. Vasquez appealed Castro's decision and reiterated his concerns,
while pointing out that the silent policy was longstanding, that
supervisors were aware of the practice and failed to correct it.
The response he received from Defendant Jeffrey Smith concurred with
Castro's decision, and Smith would check with his subordinates, and
that the jail was in accordance with state law requirements for out-
side yard cancellations during inclement weather. See (Exhibit "8")

13. Thereafter, Vasquez was offered indoor rec. However, it was
in the confines of the B.A.U. hallway where he was placed in restraints
for his exercise time and subjected to pace back and forth.
January 27, 2019, Vasquez grieved the issue claiming that the policy
restricted his ability to exercise. Vasquez noted that he was not
assaultive toward staff and took his rec. alone. The inability to

-7-

-exercise properly caused muscle to atrophy, back pains, mental and
emotional distress because of long periods inside his cell. Vasquez
again pointed out that there was an indoor gym that was readily
available to meet those needs but the jail refused to offer it.

14. The response he received from Castro was that indoor rec.
in restraints permitted exercise of large muscle groups while
maintaining a safe environment. Castro stated that Vasquez could
use the rest of his cell time to exercise his other muscles, and
that the jail policy was consistent with state law requirements.
Castro also urged Vasquez to speak to mental health if he had any
mental health concerns. See (Exhibit "9")

15. Vasquez later appealed that decision and reiterated his
concerns while advising supervisors of his injuries that resulted from
their policy. The administration refused to offer any alternatives
or solutions to the problem. Vasquez also pointed out that state law
required segregation inmates an hour of exercise daily. But did not
dictate that inmates be placed in restraints, that was a policy created
at Berks County Jail. Vasquez asked that they revisit the statute
and do away with the current policy. But the response Vasquez
received from Smith concurred with Castro. That they were in
compliance with state regulations regarding recreation in restraints.
See (Exhibit "10")

16. January 31, 2019, Vasquez met with the Institutional
Classification Committee ("I.C.C.") Lieutenenant Weber was in
attendance. During the meeting Vasquez voiced several issues of
concern including the inability to properly exercise. He asked I.C.C.
why delta inmates could not use the indoor gym. The response he
received was that all units recreationed on the units no one used

-8-

-the gym. See (Exhibit "11")

17. The inability to exercise properly caused Vasquez to develope worst pains in his lower back. He requested to meet with a medical provider who later prescribed him muscle relaxer. Vasquez again met with I.C.C. and told them about his injuries due to the inadequate exercise policy. However, I.C.C. stated the issue was already addressed. See (Exhibit "12") Next, he spoke to mental health and explained that the inability to exercise coupled with the uncertainty of his case had caused a great deal of stress.

18. Along with the lack of furniture, and inadequate exercise, the entire unit suffered deterioration. The combination of supervisory neglect, maintenance neglect, and seasonal weather caused part of the structure to erode. Whereas, some cells the window pretruded from the wall, which caused rain and snow to seep in from the outside. Some inmates were forced to plug up the holes with toilet tissue because maintenance neglected to keep up with the problem. See (Exhibit "13")

19. The old furnances moved off its structure, so whenever inmates were in disagreement the person on the second tier would "make it-rain" on the person on the first floor, meaning poor unrine, feces, or toilet water down the side of the pole directly into the cell on the first floor.

20. Toilets leaked for months on in without repair, to the point the only solution unit officers had were to offer extra towels to soak up the water. Because toilets were set on timers that allowed two flushes every 45 minutes to an hour, made unsanitary sewage leak from the toilets which caused a foul smell on the unit. See (Exhibit "14")

-9-

21. There was mold growing from behind the poles in the cell as well as in the shower stalls. The vents were caked up with dust and toilet tissue that air hardly blew through and when it did dirt and hair came out of it regulary. Spiders, centipedes, and waterbugs crawled out of the vents and old furnaces regularly. When it rained heavily water came up from the drains in the hallway, which would also push sewage up as well. On the second tier water leaked from the ceilings because the roof was falling apart. Paint in the cells had either chipped or created bubble like air pockets that would crumble into dust particles, which Vasquez breathed in regularly. Because the jail was built in the 1930's the paint was lead based, hazardous,and caused Vasquez to contract sore throats, headach like pains, high blood pressure, and dizziness.

22. Vasquez requested to see a medical provider and explained that he notice spec's of blood in his saliva and beleived it was attributed to the dust particle he'd been breathing in. See (Exhibit "15") That same day Vasquez filed a request to maintenance to have the cell's repainted. See (Exhibit "16") Vasquez was later seen by medical and treated for his symtoms. Defendant Dreppert also responded to Vasquez request stating that maintenance was working on the logistics of repainting the cell's.

23. Next, Vasquez filed a grievance on the conditions and pointed out that he had been breathing in hazardous materials for some time and that the jail had been aware that the conditions on delta were not up to standards but refused to take reasonable measures to correct the problem.

24. The repsonse Vasquez received from Dreppert was that the dust particles Vasquez referred to was the equivalent of "salt" that

-10-

Ref: 2146868 pg 40 of 78 for RAMON VASQUEZ

formed from moisture and was common in masonary concrete building
blocks, and assured Vasquez that it was harmless. See (Exhibit "17")

25. Vasquez spoke to other inmates in the B.A.U. to see if the
conditions were the same in their cell's, and they all agreed. It
was at that point that Vasquez and witnesses: Dontae Oliver, Jose
Reyes, Thomas Putt, and Malik Hart decided to contact multiple
agencies to request help. First they'd contacted the Pa. Dept. of
Health & Human Public Safety. See (Exhibit "18")

26. A few days later, Vasquez appealed Drepperts decision, and
pointed out that the dust particles were in fact paint and not salt.
Vasquez noted that the overall conditions were a health risk, that
the adiminstration had been aware of the conditions for years but
failed to do anything about it. Vasquez also stated that some of
his concerns were grieved in the past but was still ignored. Quigley
however, requested an extension to conduct a review. In the mean
time Vasquez & others reached out to O.S.H.A. and Teresa Miller,
Secretary of Human Services in Harrisburg, Pa. requesting someone
investigate the conditions of confinement in delta unit. See
(Exhibit "19")

27. March 19, 2019, Vasquez filed a request to Quigley asking
for minimal neccesities in the cell, such as furniture. See
(Exhibit "20") The next day, he filed a grievance contesting the
lack of furniture in the cell. Vasquez explained that he had to
eat sitting on his toilet or placing his tray on the toilet as if
it were a table while sitting on the concrete slab to eat his meals.
The reponse he received from Castro referred him to a grievance he
submitted on the same issue back in 2014, # 066-14. Whereas Castro
and Smith told Vasquez that the concrete slab in his cell, was an

-11-

- elevated surface that should serve all his needs. See (Exhibit "21")
In conclusion, Castro decided not to address the grievance because
it was already addressed. Castro also advised Vasquez to seek
medical attention for his injuries, which he did. See (Exhibit "22")

28. March 25, 2019, O.S.H.A. replied to Vasquez and advised him
to contact the county commissioners with his concerns. See (Exhibit "23")

29. As such, Vasquez contacted both American Civil Liberties
Union ("A.C.L.U.") and Berks County Prison Board; Defendant's
Christian Leinbach, Kevin Barnhardt, Mark Scott, Scott Lash, John
Adams, Eric Weaknecht, Christine Sadler, and S. Graffius to put them
on notice of the overall conditions the jail was subjecting him to,
and ask the prison board to correct the problem. See (Exhibit "24")

30. Several days later, Vasquez had an argument with the inmate
on the second tier, which resulted in him pooring urine & feces down
the pole into Vasquez cell. Vasquez cleaned up the mess then filed a
grievance on the faulty structure, Vasquez stated the jail needed to
do something about it because he was tired of cleaning human waste.
But the response he got from Weber was that he should've notified the
unit officer. Weber then refused to address the issue. See (Exhibit "25")

31. Accordingly, Vasquez resubmitted his grievance to clarify
himself stating he notified the officer, who merely looked in his
cell shook his head and kept walking. Vasquez again noted his concerns
about the unsanitary health risk.

32. April 10, 2019, Quigley, Smith, & Dreppert did an inspection
of the B.A.U, Lt.Kirlin did an in camera inspection of Vasquez cell.
Quigley later responded to grievance # 0318-19 stating that as
Dreppert explained before the "white substance" was part of the
masonary blocks. She also noted missing paint on the walls, small

-12-

crevices, and ventilation issues. But she put it off on maintenance that the dust particles were harmless. She also gleened toward a justification that although unfavorable to look at the damage was merely a cosmetical issue and nothing hazardous. See (Exhibit "26")

33. That same day Dreppert responded to grievance # 0454-19, stating that he had been part of the inspection team that morning and claimed that renovations were under way. See (Exhibit "27")

34. That same evening Vasquez got into another argument with the person upstairs who again poored urine down the pole. Vasquez notified the unit officer, then appealed his grievance. Vasquez stated that until the poles were removed from the cell the problem would continue, he then requested to be moved upstairs until renovations were complete. The next day he was moved upstairs to cell 214. Quigley later responded and conceded that she was aware of the opening and assured that maintenance would seal the space. See (Exhibit "28")

35. April 12, 2019, Vasquez received a memo from Castro stating that the jail received notification from Pa.D.O.C. about a letter Vasquez sent to Pa. Dept. of Human Services who forwarded to them, who then forwarded it to B.C.J. The contents of the memo advised Vasquez to continue using the grievance system for any concerns. See (Exhibit "29")

36. As such, April 24, 2019, Vasquez received a news article written April 11, 2018, by Karen Shuey of the Reading Eagles Newspaper. Ms. Shuey was given a tour of the jail and reported "Officials say" the facility has outlived its usefulness and needed to be replaced. Shuey even added that "offenders needed to be held in conditions that were not hazrdous to their physical or mental health. That Berks County Jail had some room for improvements on that front.

-13-

-that front. The portion of the prison built in 1933 had some significant structural issues like crumbling walls and falling plaster". See (Exhibit "30")

37. May 1, 2019, Vasquez recevied a letter from Thomas E. Greishaw Director Office of County Inspection & Services. He told Vasquez that Pa.D.O.C. only had statutory responsibilities under Pa. Code title 37 chapter 95 for inspection of county correctional institutions on an annual basis, but not direct oversight of investigatory authority. County Correctional Institutions in the Commonwealth were not under the jurisdiction of the state. He recomended Vasquez address his concerns with the B.C.J. administration or the Prison Board. See (Exhibit "31")

38. While Quigley and Dreppert promised renovations to the unit the only thing that occured were the removal of 4-5 furnances nothing else. Vasquez decided to reach out to Ms. Shuey and advise her that the jail was still subjecting him and other similarly situated inmates to deplorable conditions. May 11,2019, Shuey wrote a front page article about plans to build a new jail and estimated the cost would be 200 million dollars. She also described the reasons, namely, the old part of the jail which was of main concern was falling apart. See (Exhibit "32") After the article was published all maintenance work on the unit abruptly stopped. There were still issues with broken toilets that leaked for months without repare namely in cell's 211 & 208, whereas that water seeped into the hallways.

39. About a week after Shuey's article regarding the jail was published another article came out about building a new jail, and the county commissioners reaction to the cost. However,knowing the

-14-

-the conditions were not up to standards the prison board nor the jail administration took any steps to improve the living conditions on Delta unit.

### INJURIES

40. Vasquez, suffered bodily injuries, pain and suffering, mental and emotional distress, and loss of standing.

### EXHAUST OF ADMINISTRATIVE REMEDIES

41. Vasquez exhausted all of his administrative remedies to the top chain of command. See (Exhibit's "1-32")

### WITNESSES

- .Dontae Oliver #17-4468, B.C.J.S., 1287 County Welfare Rd., Leesport, Pa. 19533
- . Jose Reyes #11-3720, B.C.J.S. 1287 County Welfare Rd., Leesport, Pa. 19533
- . Thomas Putt #09-1702, B.C.J.S., 1287 County welfare Rd., Leesport, Pa. 19533
- . Malik Hart #13-6051, B.C.J.S., 1287 County Welfare Rd., Leesport, Pa. 19533
- . Karen Shuey, Reading Eagle Newspaper, 345 Peen St., Reading, Pa. 19603-0582
- . Other witnesses as they become available.

Ref: 2146868 pg 50 of 78 for RAMON VASQUEZ

## CLAIMS FOR RELIEF

**SUBSTANTIVE CLAIMS**

42. Vasquez hereby incorporates all the above-mentioned paragraphs as if fully set forth herein.

**COUNT I.**

43. Defendant, Berks County, by way of Defendant's who may fairly be said to represent the Berks County Prison board, created a policy or custom both directly and indirectly that lacked sufficient safeguards to protect Vasquez from substandard conditions inside the jail; failed to train their employees to prevent such conduct; failed to properly supervise the employees to prevent such conduct; failed to properly supervise the employees, which created an environment where such misconduct was tolerated and encouraged; and failed to take action when confronted with a pattern of misconduct, which governmental entities condoned and encouraged; constituted the Tort of Negligence Respondeat Superior under Pennsylvania law.

**COUNT II.**

44. Defendant's, Leinbach, Barnhardt, Scott, Lash, Adams, Weaknecht, Graffius, Sadler, Quigley, Smith, Casatro, Weber, and Dreppert, each had actual knowledge that the totality of conditions on delta unit were substandard and posed a substantial risk to Vasquez health and safety, collectively, and deliberately, disregarded said knowledge, by choosing to follow a course of action that subjected Vasquez to inadequate exercise, lack of furniture, hazardous materials, unsanitary and unhealthy conditions. Both inside the cell and on the unit, thus resulted in

–16–

Ref: 2146868 pg 52 of 78 for RAMON VASQUEZ

harm, and violated Vasquez right to be free from Cruel and Unusual Punishment under the Eighth Amendment of the United States constitution.


COUNT III.

45. All Defendant excluding Defendant Berks County each owed Vasquez a reasonable standard of care in providing a safe and healthy environment, breached that duty by knowingly subjecting Vasquez to substandard conditions, which caused physical harm, constituted the Tort of Negligence under Pennsylvania law.

COUNT IV.

46. All defendant's excluding Berks County, were responsible for a policy that created atypical and significant hardship in relation to ordinary incidents of prison life, the use of food as punishment before and after the disposition of Vasquez disciplinary hearing was added punishment on top of the principal infraction was imposed automatically without a hearing or opportunity to be heard, was unfair, arbitrary, and excessive in light of maintaining security; violated Vasquez right to Due Process under the Fourteenth Amendment of the United States constitution.

COUNT V.

47. All defendant's excluding Berks County each had actual knowledge of the substandard conditions on delta unit, but refused to collectively adhere to standards of professional conduct as a prison board, and jail administration.  Knowingly subjected Vasquez

-17-

Ref: 2146868 pg 54 of 78 for RAMON VASQUEZ

to such conditions, which were extreme, outrageous, and intolerable in a civilized community; constituted the Tort of Intentional Infliction of Emotional Distress under Pennsylvania law.

### PRAYER FOR RELIEF

. Wherefore, Plaintiff, Ramon Vasquez, respectfully prays that this court enter a judgment
in the following:

. Grant Plaintiff a declaration that the acts and omissions described herein violated his rights under the United States constitution, and laws of Pennsylvania.

. Grant compensatory damages in the amount of 540,000.00 $ jointly and severally against defendant's Leinbach, Barnhardt, Scott, Lash, Adams, Weacknecht, Graffius, Sadler, Quigley, Smith, Castro, Weber, and Dreppert, for failing to protect Vasquez from Cruel and Unusual Punishment.

. Grant compensatory damages in the amount of 500,000.00 $ against Defendant Berks County for vicarious liability of the Berks County Prison Board.

. Grant compensatory damages in the amount of 390,000.00 $ jointly and severally against Leinbach, Barnhardt, Scott, Lash, Adams, Weacknecht, Graffius, Sadler, Quigley, Smith, Castro, Weber, and Dreppert, for the Tort of Negligence.

. Grant compensatory damages in the amount of 390,000.00 $ jointly and severally against Leinbach, Barnhardt, Scott, Lash, Adams, Weacknecht, Graffius, Sadler, Quigley, Smith, Castro, Weber, and Dreppert, for the Tort of Intentional Infliction of Emotional Distress.

-18-

Ref: 2146868 pg 56 of 78 for RAMON VASQUEZ

. Grant punitive damages against all defendant's excluding Berks County in the amount the court deem just and proper, for violating Vasquez right to Due Process, and the wanton disregard for Vasquez health and safety.

. Award attorney fees and cost to Vasquez.

. Award any additional relief the court deem just and proper.

Respectfully submitted,

Dated: ___10/7/___, 2020

*Ramon Vasquez*
Ramon Vasquez # MG 9685
SCI- Huntingdon
1100 Pike st.
Huntingdon, Pa. 16654-1112

-19-

**VERIFICATION**

I, Ramon Vasquez, hereby verify that the foregoing information contained herein is true and correct to the best of my knowledge and understand that if willfully false I am subject to penalties of perjury pursuant to 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Dated: _10/ 7/_ , 20_20_

_Ramon Vasquez_
Ramon Vasquez #

Ref: 2146868 pg 59 of 78 for RAMON VASQUEZ

("Exhibit 1")

# BERKS COUNTY JAIL SYSTEM
## ADMINISTRATIVE SEGREGATION RECORD

| | | |
|---|---|---|
| Name: **Vasquez, Ramon** | BCJS: **2009-6214** | Cell: from I/R to **D-119** |
| Date: **1/3/2019** | Time: **2011** | Incident Location: **Intake** |

Type of Segregation: **Security**

**INMATE NOTIFICATION**
1. You are being specially confined in close custody status for reasons outlined on this form.
2. You have the right to present rebuttal information or mitigating circumstances via an Inmate Communication Form.
3. Your status will be reviewed regularly by the Inmate Classification Committee (ICC).

**For Voluntary Protective Custody Request Only**

I, (print) _____, request to be placed in Protective Custody. This is made of my own free will, and I will not hold Berks County Jail System nor any staff member responsible for this choice. I understand that Protective Custody requires that I remain in a locked cell except exercise periods, and that I shall exercise alone or in small groups according to security needs.

Inmate Signature: _____

Supervisor signature denotes witnessing inmate signature of Protective Custody request.

Supervisor Signature: _____   Date: _____

Summary:
The inmate has been placed into Administrative Segregation, Security Status by the authority of the Warden. Inmate has been moved to D-unit BAU. This action is based on security concerns due to the inmate's sentence. The inmate will remain in security status until released by Warden Quigley or her designee and reviewed by the Inmate Classification Committee (ICC).

Supervisor Print and Sign: Sgt. Roberts _Sgt._ ~~_____~~

Confinement Conditions:

☒  Conditions of Confinement – (imposed as consistent with above outline circumstances)
   **Security, CBB, EXA**

☐  Physical Restraints (excluding transports) Type: Type of physical restraint. Duration: Enter duration
   Authorized by: Click here to enter authorizing staff name. Date: Enter a date.   Time: Enter time.

☒  Copy given to inmate by **BER** (Delivering Officers Initials)

| ADMINISTRATIVE REVIEW | RELEASE FROM SEGREGATION |
|---|---|
| Date: _____ Time:_____ | Date: _____ Time:_____ |
| _____ Reviewed and Sustained | Notation: _____ |
| _____ Referral to: _____ | _____ |
| _____ Status Modified: _____ | _____ |
| ~~Warden/D.W./Cpt./Lt.:~~ _____ | ~~Warden/D.W./Cpt./Lt.:~~ _____ |

Copy distribution: 1) Original – Treatment   2) D.W. Custody   3) Housing Unit   4) Inmate

("Exhibit 2")

## 6.2  Administrative Segregation (ADSEG)

Administrative segregation refers to a type of housing reserved for the protective care and secure management of identified inmates.  It is not a punitive status, but is designed to provide special care for those who cannot be housed in the general inmate population.  The categories of administrative segregation are described below:

- **MALADAPTIVE** - Segregation for those who display a pattern of unmanageable behavior.  You are also assigned to this status when disciplinary charges have been filed against you and you have been referred to a hearing board.
- **DISCIPLINARY** – Segregation for those who have been found guilty of their disciplinary changes.
- **MEDICAL** - Segregation for those whose physical health requires close monitoring.
- **MENTAL HEALTH** - Segregation for those whose mental health requires close monitoring.
- **PROTECTIVE CUSTODY** - Segregation for protection from another inmate or group of inmates.  You may request this status or be placed into it for administrative reasons by the Inmate Classification Committee (ICC) or Supervisory Staff of the Jail.
- **SECURITY** - Segregation for those who are a risk for escape, a danger, demonstrate violence toward others, pose a serious security threat to the institution, and those who have received a sentence of life imprisonment or the death penalty.  If you are temporarily transferred here from another facility, refuse to provide information, or fail to cooperate during the commitment process you may be assigned this status.

Assignment to an ADSEG unit occurs only by a written administrative segregation order that is processed through the ICC and approved by the Warden, Deputy Warden, or Lieutenant.  You will receive a copy of this order if it is necessary to segregate you.  Similarly, release from segregation occurs upon recommendation of the ICC with the approval of the Warden or Deputy Warden.

When a security or medical need requires immediate segregation, a shift commander may issue a verbal order, which will later be followed by a written order.

While you are in administrative segregation the ICC will regularly review your status.  At thirty (30) day intervals, a classification hearing will be held for those inmates in maladaptive or security segregation.

If you are held in administrative segregation for more than thirty (30) days you will be seen by the staff psychologist.  Follow up interviews will be held periodically.  Administrative segregation status imposed by other jails/prisons will be honored by this jail.

# ("Exhibit 3")

**BERKS COUNTY JAIL SYSTEM**
**INMATE COMMUNICATION FORM**

Inmate Name: Ramon Vasquez          BCJ #: 09-6214
Unit/Cell #: D-122          Date: 8/16/18

**TO:**    (Select only one of the following; selecting more than ONE box will result in your communication being filed unanswered.)

- ☐ Booking/Mail/Property
- ☐ Chapel
- ☐ Commissary
- ☐ Custody
- ☐ Deputy Warden
- ☐ Education
- ☐ Inmate Accounts
- ☐ Inmate Telephones
- ☐ Kitchen
- ☒ Medical
- ☐ SOG Commander
- ☐ Treatment
- ☐ Warden
- ☐ Other_____

Write legibly, supply all relevant details. Forms which are unclear or contain demeaning language, threats or profanity will not be addressed. **ONLY ONE TOPIC PER COMMUNICATION.**

I'm having pains in my back and right arm, the conditions in the BAU force me to lay or sit on the floor for long periods of time when ever I'm writing or reading. The injury to my arm is pre existing from a motorcycle crash and is becoming aggitated again. I'm requesting to see a doctor or someone about this.

Thank You ☺

Note: Writing in "response" section will result in form being unanswered and filed.

Inmate Signature: Ramon Vasquez

**RESPONSE:** I/nage 8/10/18 Quinn

You are scheduled to see the provider, please discuss then

Date 8/1/18  Staff Member (Print) C.800  and (Sign) C.800

CC:

BCJS 501U-5/2015          Original – Treatment File          Canary – Return to inmate with response

# ("Exhibit 4")