**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| RAMON VASQUEZ, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 20-CV-5116-JMG |
| | : | |
| BERKS COUNTY, *et al.*, | : | |
| Defendants. | : | |

---

**MEMORANDUM OPINION**

Plaintiff Ramon Vasquez, a prisoner currently incarcerated at SCI-Huntingdon, brings this *pro se* civil action pursuant to 42 U.S.C. § 1983, raising constitutional claims and state tort claims based on the conditions in which he was incarcerated at the Berks County Prison ("BCP"). For the following reasons, the Court will dismiss certain claims and permit Mr. Vasquez to proceed on his remaining claims.

## I. FACTUAL ALLEGATIONS[1]

Mr. Vasquez's brings his Complaint against Berks County, eight members of the Berks County Prison Board — Christian Leinbach, Kevin Barnhardt, Mark Scott, John Adams, Scott Lash, Eric Weaknecht, S. Graffius, and C. Sadler — and five BCP employees — Warden Janine Quigley, Deputy Warden Jeffrey Smith, Miguel Castro (identified as Captain of security and grievance coordinator), Dreppert (identified as "the person in charge of the maintenance department") and Lt. Weber (identified as "Lieutenant of security, member of the Institutional

---

[1] The following allegations are taken from Vasquez's Complaint and exhibits attached to the Complaint.

Classification Committee, and grievance coordinator").  Compl. at 2-3.  Mr. Vasquez seeks damages for alleged violations of his constitutional rights and is suing the Defendants in their individual capacities.

In August 2018, Mr. Vasquez was transferred to BCP on a writ in connection with post-conviction proceedings in state court.[2]  *Id.* at 4.  Mr. Vasquez was housed on the disciplinary segregation unit, also know as the Delta Unit, and placed on security status in the Behavioral Adjustment Unit, located on the first floor of the Delta Unit.  *Id.*  He was informed that he was placed on security status because of his sentence, and alleges his placement was "contrary to jail policy" because he "was not a lifer nor on death row."[3]  *Id.*  Mr. Vasquez claims he previously filed a lawsuit challenging "multiple tainted policies in the jail" when he was last housed there —apparently "several years" ago — and believes "the security status was arbitrarily imposed by the warden and other supervisors in retaliation" for his prior lawsuit.  *Id.*  The Complaint and attached exhibits reflect that Mr. Vasquez's security status was regularly reviewed.  *Id.* Exs. 1, 2, 11 & 12.

---

[2] Mr. Vasquez was convicted of aggravated assault and harassment in the Berks County Court of Common Pleas and sentenced to a minimum of five years and a maximum of twenty years of imprisonment.  *See Commonwealth v. Vasquez*, CP-06-CR-0004053-2014 (Berks C.P.).

[3] An exhibit attached to the Complaint, which reflects the BCP's policy on administrative segregation, defines security status as:

> Segregation for those who are a risk for escape, a danger, demonstrate violence toward others, pose a serious security threat to the institution, and those who have received a sentence of life imprisonment or the death penalty.  If you are temporarily transferred here from another facility, refuse to provide information, or fail to cooperate during the commitment process you may be assigned this status.

Compl. Ex. 2.  Security status is not limited to inmates with a life sentence or death sentence as Mr. Vasquez suggests.

On October 11, 2018, Mr. Vasquez received a misconduct for having medication in his cell and received ten days of disciplinary time for the violation. *Id.* at 5. According to Mr. Vasquez, per BCP policy, an inmate who receives a misconduct is automatically placed on maladaptive status pending the outcome of the misconduct proceeding. *Id.* This change of status "automatically imposed restrictions [on Vasquez] such as change from regular meals to lunch bags which consisted of bologna sandwiches every day except for breakfast when cold cereal was given."[4] *Id.* Mr. Vasquez contends that the automatic imposition of this food restriction violated his due process rights because his misconduct was "not for throwing feces or being assaultive with food" and he was not given a hearing prior to the imposition of the restriction. *Id.* He filed grievances raising his concerns, which Defendants Castro and Warden Quigley denied. *Id.* at 6 & Exs. 4 & 6.

Mr. Vasquez was also dissatisfied with his options for recreation during cold winter months. He alleges that during the winter, it was common for unit officers to "offer inmates outside yard without proper clothing such as winter coats, winter hats, gloves, or footwear." *Id.* at 6. As a result, many inmates refused outdoor recreation on these occasions, and it appears that Mr. Vasquez was among them. *Id.* Ex. 7 (indicating that Vasquez was among the inmates who refused outdoor recreation due to the cold). Mr. Vasquez was offered indoor recreation on the unit as an alternative on these occasions, but he was required to wear handcuffs during indoor recreation on the unit. *Id.* at 6-8. Mr. Vasquez claims his ability to exercise was impeded by this restriction, which "caused muscle to atrophy, back pains, [and] mental and emotional distress

---

[4] An exhibit attached to the Complaint, which reflects the BCP's policy on disciplinary segregation, states that inmates placed in disciplinary segregation will have their activities and privileges restricted, including restrictions on food. Compl. Ex. 5.

because of long periods inside his cell." *Id.* at 7-8.  He sought medical treatment for lower back pain and received a muscle relaxer.  *Id.* at 9.

Mr. Vasquez filed grievances in which he "request[ed] better exercise conditions [without] restraints" including permission to use the indoor gym during inclement weather.  *Id.* Exs. 7, 8, 9 & 10.  Defendants Castro and Deputy Warden Smith responded that inmates were permitted to recreate outdoors unless weather was inclement, that Vasquez was never forced outside in the cold, that even with restraints Mr. Vasquez could exercise large muscle groups, and that the gym would not be made available to him.  *Id.*  Mr. Vasquez also raised concerns about recreation at hearings concerning his security status, where Defendant Weber was present. *Id.* at 8; *see also* Exs. 11 & 12.

Most of Mr. Vasquez's allegations concern the physical condition of the Delta Unit.  Mr. Vasquez alleges that Delta Unit was "part of the old jail," which was built in 1933 and had significant structural damage due to its age.  *Id.* at 4.  Although he was housed on security status in the Delta Unit, it appears that the conditions on this unit may have been the same as the rest of the "old jail."  *Id.* at 6 (stating that "the conditions of confinement on delta were not in itself different or separate from the rest of the jail").[5]  Mr. Vasquez states that his cell "consisted of a concrete slab where his mattress went, a toilet, and a window.  There were no desk, seat, shelves, or hooks for his clothing and towels."  *Id.* at 4-5.  Mr. Vasquez would write letters by laying on the floor or concrete slab and avers that "long hours in these positions" exacerbated a preexisting injury in his right arm and shoulder.[6]  *Id.* at 5 & Ex. 3.  Due to the absence of furniture, Mr.

---

[5] Mr. Vasquez also states this assertion in one of his grievances.  Compl. Ex. 6 ("Conditions of confinement on Delta are NOT in itself separate from the rest of the jail.").

[6] Mr. Vasquez sought and received medical attention for this issue.  *See* Compl. at 5 & Ex. 3.

Vasquez claims that he had to eat by sitting on his toilet or by placing his meal tray on the toilet. *Id.* at 11.

Mr. Vasquez contends that the unit had deteriorated as a result of a "combination of supervisory neglect, maintenance neglect, and seasonal weather." *Id.* at 9. According to Mr. Vasquez, the window protruded from the wall in some cells, causing rain and snow to enter the cell and requiring inmates to use toilet paper to plug the holes "because maintenance neglected to keep up with the problem." *Id.* He further states that "old furnaces moved off [their] structure, so whenever inmates were in disagreement the person on the second tier would 'make it rain' on the person on the first floor, meaning [pour] urine, feces, or toilet water down the side of the pole directly into the cell on the first floor." *Id.* As in inmate housed on the first tier, Mr. Vasquez purportedly found himself the victim of this practice and regularly cleaned human waste from his cell. *Id.* at 12-13 & Ex. 25. After complaining about this practice, Mr. Vasquez was at some point moved to a cell on the second tier. *Id.* at 13.

Mr. Vasquez also claims that the toilets leaked for months without repair and would leak sewage, causing the unit to smell. *Id.* at 9 & Ex. 14. He claims mold grew behind the poles and in the shower stalls, that vents were "cake[d] up with dust and toilet tissue" such that "air hardly blew through and when it did dirt and hair came out" along with spiders, centipedes, and water bugs. *Id.* at 10. He further states that heavy rains would cause water to come up through the drains in the hallway, pushing sewage up into the unit, and water leaked from the ceilings because the roof was falling apart. *Id.* Mr. Vasquez also claims that he was breathing lead paint particles as a result of the deteriorating facility, which caused a sore throat, headaches, high blood pressure, and dizziness. *Id.* He sought medical attention when he noticed blood in his

saliva, which he "believed . . . was attributed to the dust particle[s] he'd been breathing in." *Id.* at 10 & Ex. 15.

Mr. Vasquez filed several grievances about these issues, to which Defendants Castro, Quigley, and Dreppert responded. *Id.* Ex. 13, 14, 16, 17, 20, 21, 22, 25, 27.  In response to a grievance in which he requested maintenance repaint the cells, Mr. Dreppert responded, "we are working on the logistics for stripping and re-painting all of Delta Unit as well as other improvements." *Id.* Ex. 16; *see also* Ex. 27.  Mr. Dreppert also told Mr. Vasquez, in response to a grievance Mr. Vasquez filed about dust particles on the unit, that the particles were essentially salt and that they "exist[] naturally as part of the masonry process" and were "not harmful." *Id.* Ex. 17.  Quigley, Smith and Dreppert inspected Mr. Vasquez's cell in response to his grievances and, according to Vasquez, concluded that the dust particles were harmless and that the issues with the cell were cosmetic and not hazardous. *Id.* at 13 & Ex. 26.  Quigley and Dreppert's responses indicate that Delta Unit was being redone, which included repainting and potentially sealing the openings near the poles in the cells. *Id.* Exs. 16, 26 & 28.  However, Mr. Vasquez alleges that apart from the removal of four or five furnaces, the promised renovations did not materialize. *Id.* at 14.

In the meantime, Mr. Vasquez reached out to various state and federal agencies to express concerns about the conditions on the Delta Unit. *Id.* Ex. 18, 19.  He also eventually contacted members of the Berks County Prison Board — Defendants Leinbach, Barnhardt, Scott, Lash, Adams, Weaknecht, Sadler, and Graffius — to "put them on notice of the overall conditions" and to "ask the prison board to correct the problem." *Id.* at 12 & Ex. 24. Additionally, one of Mr. Vasquez's letters was forwarded by the Pennsylvania Department of Corrections to "Commissioner Kevin Barnhardt, Berks County Prison Board Chairperson, and

Warden Janine Quigley, as they are in immediate positions to review [Vasquez's] concerns and determine further action." *Id.* Ex. 31.  Mr. Vasquez also attached to his Complaint articles about the structural issues at the BCP and the County's options for addressing the situation.  *Id.* Ex. 30 & 32.  He alleges that although the prison board and the "jail administration" were aware of the long-standing issues with the facility, they did not take "any steps to improve the living conditions on Delta unit."  *Id.* at 14-15.

Based on the above allegations, Mr. Vasquez brings constitutional claims challenging his placement on Delta Unit, the food restriction placed upon him when he received the misconduct, and the overall conditions on the Delta Unit.  Regarding his conditions claims, Mr. Vasquez asserts that "inadequate exercise, lack of furniture, hazardous materials, and unsanitary and unhealthy conditions" at BCP violated his Eighth Amendment rights.  *Id.* at 16.  Mr. Vasquez also brings tort claims under Pennsylvania law.  Mr. Vasquez seeks damages under both causes of action.

## II.      STANDARD OF REVIEW

As Vasquez is proceeding *in forma pauperis*, 28 U.S.C. § 1915(e)(2)(B)(ii) applies, which requires the Court to dismiss the Complaint if it fails to state a claim.  Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  Conclusory allegations do not suffice.  *Id.*  The Court construes Vasquez's allegations liberally.  *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).

### III.    DISCUSSION

#### A.  Placement on Security Status

Mr. Vasquez challenges his security status in part.  This status led to his placement on the

Delta Unit and the BAU.  His claim is best construed as a due process claim.  It is well-settled

that prisoners have no inherent constitutional right to any particular security classification or to

any particular housing assignment.  *See Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005) ("We

have held that the Constitution itself does not give rise to a liberty interest in avoiding transfer to

more adverse conditions of confinement.").   Rather, in the prison context, "[d]ue process

protection for a state created liberty interest is . . . limited to those situations where deprivation of

that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life.'"  *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin v.

Conner*, 515 U.S. 472, 484 (1995)).  "[C]onfinement in administrative or punitive segregation

will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison

life necessary to implicate a liberty interest."  *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir.

2002) (quoting *Sandin*, 515 U.S. at 486));  *see also Fraise v. Terhune*, 283 F.3d 506, 522-23 (3d

Cir. 2002) ("Although inmates who are transferred to the STGMU [Security Threat Group

Management Unit] face additional restrictions, we hold that the transfer to the STGMU does not

impose an atypical and significant hardship in relation to the ordinary incidents of prison life.").

In deciding whether conditions are atypical and significant for purposes of establishing a liberty

interest, a court must consider "(1) the duration of the challenged conditions; and (2) whether the

conditions overall imposed a significant hardship in relation to the ordinary incidents of prison

life."  *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 560 (3d Cir. 2017).  In

determining whether a hardship is atypical or significant, the relevant comparator is the general population. *Id.* at 564.

It appears that Vasquez was held in segregation for a period of approximately two years. However, it is unclear how the conditions on the Delta Unit compare to those in the general population; the Complaint suggests that the conditions on the Delta Unit "were not in itself different or separate from the rest of the jail." Compl. at 6. The focus of Mr. Vasquez's allegations concern the dilapidated state of the BCP, the absence of furniture in his cell, and his concern that, although outdoor recreation is permitted, during cold weather the option to recreate indoors is insufficient because he must wear handcuffs during recreation time. These allegations are insufficient to establish a plausible claim that Mr. Vasquez was subjected to atypical conditions for a significant period of time that would give rise to a liberty interest. This is especially true given that it is not clear what, if any, additional restrictions to which Mr. Vasquez was subjected as a result of his security status. *See Wilkerson v. Goodwin*, 774 F.3d 845, 855 (5th Cir. 2014) ("[T]he duration in segregated confinement that courts have found does not give rise to a liberty interest ranges up to two and one-half years."); *Griffin*, 112 F.3d at 708 (holding that "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed . . . by a court of law" and does not constitute a due process violation (quotation omitted)); *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998) (confinement in administrative segregation for two and one-half years was not atypical and significant hardship).

Even assuming Mr. Vasquez has alleged a plausible basis for a liberty interest, it appears he received the process that was due. The policy attached to his Complaint reflects that inmates in maladaptive or security segregation receive notice of their placement and hearings at thirty-

day intervals for regular review of their status.[7]  *See* Compl. Ex. 2.  Other documents attached to

the Complaint indicate that Mr. Vasquez received these hearings.  *See id.* Ex. 1, 11 & 12.  That

periodic review provides the process required under the circumstances.  *See Bracey v. Sec'y Pa.*

*Dep't of Corr.*, 686 F. App'x 130, 135-36 (3d Cir. 2017) (per curiam) (concluding that, even if

inmate suffered a deprivation of a protected liberty interest, "the periodic review offered to

Pennsylvania inmates who are indefinitely confined in administrative confinement comports with

procedural due process" where policy provided for review every ninety days and inmate's

placement on another status added "another layer of periodic review"); *Dockery v. Beard*, 509 F.

App'x 107, 113 (3d Cir. 2013) (per curiam) ("Assuming that Dockery has a protected liberty

interest because of the length of time he spent in special housing units, the record establishes that

his placement was periodically reviewed by prison staff, and such a procedure complies with due

process."); *Riley v. Carroll*, 200 F. App'x 157, 159 (3d Cir. 2006) (per curiam) ("[W]e are not

persuaded that the policy of reviewing an inmate's status once a year constitutes a deprivation of

a liberty interest."); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (explaining that in the

context of administrative segregation, "an 'informal, nonadversary review' at which the prisoner

has the opportunity to state his views, satisfies the requirements of due process") (quoting *Hewitt*

*v. Helms*, 459 U.S. 460, 476 (1983)).  Accordingly, the Complaint does not state a plausible due

process claim based on Mr. Vasquez's security status and his related placement on the Delta Unit

and BAU.

    In light of Mr. Vasquez's allegation that he was placed on security status "in retaliation

[for] a previous civil action [he] filed against the jail," (Compl. at 4), he may also be raising a

---

[7] The policy also indicates that inmates temporarily transferred from another facility, such as
Vasquez (who was at BCP on a writ), may be held in security segregation.  (Compl. Ex. 2.)

retaliation claim based on his placement in the Delta Unit and BAU.  "To state a claim for retaliation, a prisoner must allege that: (1) he was engaged in constitutionally protected conduct; (2) he suffered some adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take that action."  *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)).  A prisoner filing a lawsuit is constitutionally protected conduct and being placed in administrative segregation may be sufficient adverse action for purposes of the analysis.  *See Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000).  The timing of the allegedly retaliatory behavior relative to the constitutionally protected conduct may establish a causal link between the two the for purposes of establishing motivation.  *See Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).

Mr. Vasquez's retaliation claim fails because it is entirely conclusory.  This claim is predicated exclusively on Mr. Vasquez's allegation that he was placed on security status because of a prior lawsuit that he does not describe.  He does not explain what the lawsuit was about, when it was filed, or what facts support a causal link between Mr. Vasquez's lawsuit and his placement on security status that supports a plausible inference of retaliation.  To the contrary, the Complaint indicates that Mr. Vasquez may have filed the civil action in question "several years" ago during his last incarceration at the BCP, which is not particularly suggestive as a basis for a retaliatory motive.  Compl. at 4.  Accordingly, the Complaint does not state a retaliation claim.  *See Hammonds v. Headman*, 645 F. App'x 149, 151-52 (3d Cir. 2016) (per curiam) ("Hammonds claimed that three prison officials filed misconduct reports against him because he had accused three different prison officials of wrongdoing. But neither Hammonds' second amended complaint, nor his Informal Brief on appeal, alleges any temporal connection between

11

his grievance and the misconduct reports."); *Thomas v. Brinich*, 579 F. App'x 60, 62 (3d Cir.

2014) (per curiam) (affirming dismissal of retaliation claim where "the pleadings fail to set forth

any plausible causal connection between the 2001 lawsuit and the alleged treatment Thomas

received from Dr. Ahner many years later").

### B. Food Restriction

Mr. Vasquez also asserts a due process claim based on a food restriction "automatically"

placed upon him when he received a misconduct for having medication in his cell during

inspection, for which he received ten days of disciplinary time.  Compl. at 5-6.  As a result of the

restriction, Mr. Vasquez received bologna sandwiches for lunch and cold cereal for breakfast,

rather than "regular meals."  *Id.*  Mr. Vasquez does not allege that he was deprived of

nutritionally adequate food.  *Id.* at 5.  Instead, he alleges that the imposition of this restriction

violated his due process rights because he should have been afforded a hearing and an

opportunity to be heard.  *Id.* at 5 & 17; *see also id.* Ex. 6.

As with segregation, due process protections in the prison disciplinary context are

"limited to those situations where deprivation of [the interest in question] imposes atypical and

significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Griffin*,

112 F.3d at 706 (quoting *Sandin*, 515 U.S. at 484). "Discipline by prison officials in response to

a wide range of misconduct falls within the expected perimeters of the sentence imposed by a

court of law."  *Sandin*, 515 U.S. at 485.  The food restriction placed on Mr. Vasquez for his

misconduct is not an atypical or significant hardship that implicates due process concerns.  *See*

*Sanchez v. Allen*, 611 F. App'x 792, 795 (5th Cir. 2015) (per curiam) ("Sanchez's placement on

the food-loaf diet for seven days does not implicate a liberty interest.");  *Gates v. Huibregtse*, 69

F. App'x 326, 328 (7th Cir. 2003) ("Gates's contention that the Fourteenth Amendment's Due

Process Clause required a hearing before he was placed on the nutri-loaf diet also fails.");

*Rodriguez v. FCI Fort Dix*, Civ. A. No. 16-6970, 2016 WL 6662475, at *4 (D.N.J. Nov. 10,

2016) ("Being served cold food for breakfast for four days is insufficient to impose an atypical

and significant hardship."); *Wilson v. Wetzel*, Civ. A. No. 12-516, 2013 WL 4812497, at *6

(M.D. Pa. Sept. 9, 2013) ("Wilson has failed to sufficiently allege a due process claim that his

temporary placement on a food loaf diet, for misconduct which he admits to having committed,

constitutes an atypical and significant hardship as required under *Sandin.*"); *see also Brown v.*

*Sobina*, Civ. A. No. 08-128, 2009 WL 5173717, at *6 (W.D. Pa. Dec. 29, 2009) ("While inmates

have a right to a nutritionally adequate diet, they have no constitutional right to be served a

particular type of meal."). Accordingly, Mr. Vasquez was not entitled to a hearing prior to the

imposition of this restriction upon him and his due process claim fails.

### C. Conditions on Delta Unit

Vasquez's remaining claims concern the conditions on the Delta Unit and BAU. "To

determine whether prison officials have violated the Eighth Amendment, we apply a two-prong

test:  (1) the deprivation must be objectively, sufficiently serious; a prison official's act or

omission must result in the denial of the minimal civilized measure of life's necessities; and (2)

the prison official must have been deliberate[ly] indifferen[t] to inmate health or safety." *Porter*

*v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Farmer v. Brennan*,

511 U.S. 825, 834 (1994)). Such necessities include food, clothing, shelter, medical care and

reasonable safety. *Tillman v. Lebanon Cty. Corr. Facility*, 221 F.3d 410, 418 (3d Cir. 2000).

"[I]n determining whether conditions of confinement violate the Eighth Amendment we

must look at the totality of the conditions within the institution." *Tillery v. Owens*, 907 F.2d 418,

426 (3d Cir. 1990); *see also McClure v. Haste*, 820 F. App'x 125, 128 (3d Cir. 2020) (per

curiam).  "Relevant considerations include the length of confinement, the amount of time

prisoners must spend in their cells each day, sanitation, lighting, bedding, ventilation, noise,

education and rehabilitation programs, opportunities for activities outside the cells, and the repair

and functioning of basic physical facilities such as plumbing, ventilation, and showers."  *Nami v.

Fauver*, 82 F.3d 63, 67 (3d Cir. 1996).  "To violate the Eighth Amendment, conditions of

confinement must be dangerous, intolerable or shockingly substandard."  *Riley v. Jeffes,* 777

F.2d 143, 147 (3d Cir. 1985); *Inmates of Allegheny Cty. Jail v. Pierce,* 612 F.2d 754, 757 (3d

Cir. 1979).  A prison official is not deliberately indifferent "unless the official knows of and

disregards an excessive risk to inmate health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference."  *Farmer*, 511 U.S. at 837.

Mr. Vasquez describes an old deteriorating facility with crumbling walls and inadequate

plumbing that resulted in sewage leaking into the cells and onto the unit.  He discusses problems

with ventilation, bugs, and regularly breathing particles that he claims have caused physical

harm, including sore throat, headaches, and blood in his saliva.  It appears he was continually

exposed to this combination of conditions for a period of approximately two years.  His

allegations, construed liberally, support a plausible inference at this early stage of the litigation

that he was potentially deprived of basic shelter and sanitation in a manner that caused him

physical harm.  Additionally, Mr. Vasquez filed several grievances and appeals about these

issues; his allegations and exhibits indicate that the Defendants were aware of the ongoing

structural issues at the facility which, according to Mr. Vasquez, remained unresolved.  *See

Harper v. Beard*, Civ. A. No. 08-2272, 2009 WL 1606997, at *1 n.2 (M.D. Pa. June 8, 2009)

(plaintiff could proceed on claims against individuals who were allegedly responsible for

ensuring his cell was habitable where he claims to have informed those individuals "of the hygienic problems associated with his cell, but claims that they did nothing to rectify the situation").  He also attached to his Complaint newspaper articles reflecting municipal awareness of the structural issues at the facility.  Accordingly, at this early stage of the litigation, the Court will permit Vasquez's Eighth Amendment claims to proceed so that the Defendants may respond to his Complaint.  Mr. Vasquez will also be permitted to proceed at this time on his claims related to exercise given his allegations that he suffered injuries for which he received medical treatment as a result of the restrictions on his ability to exercise during the winter.  *See Barndt v. Wenerowicz*, 698 F. App'x 673, 677 (3d Cir. 2017) (per curiam) (to determine whether a deprivation of outdoor exercise amounts to sufficiently serious deprivation for purposes of the Eighth Amendment, "courts should consider the totality of the circumstances, including, but not limited to, the length of the deprivation, the availability of recreation within the cell, and whether the inmate suffered any ill health effects as a result of the deprivation").

## IV.    CONCLUSION

For the foregoing reasons, the Court will dismiss with prejudice Mr. Vasquez's due process claims related to his placement on security status and the food restriction placed upon him for the misconduct, because amendment of those claims would be futile.  The Court will dismiss Mr. Vasquez's retaliation claim, to the extent he intended to bring one, without prejudice.

Mr. Vasquez will be permitted to proceed at this time on his Eighth Amendment and related tort claims.  An appropriate Order follows.


BY THE COURT: On December 8, 2020,


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge